K.A. MORRIS, Plaintiff-Appellant,

v.

UNITED STATES of America, the DEPARTMENT OF THE TREASURY, INTERNAL REVENUE SERVICE, Defendants-Appellees.

No. 86–3514.

United States Court of Appeals, Eleventh Circuit.

March 27, 1987.

1974), *cert. denied,* 421 U.S. 914, 95 S.Ct. 1572, 43 L.Ed.2d 780 (1975).

Craig Stephen Boda, Daytona Beach, Fla., for plaintiff-appellant.

Roger M. Olsen, Asst. Atty. Gen., Michael L. Paup, Chief, Appellate Section, Richard Farber, Murray S. Horwitz, Tax Div., U.S. Dept. of Justice, Washington, D.C., for defendants-appellees.

Before RONEY, Chief Judge, HATCHETT, Circuit Judge, and TUTTLE, Senior Circuit Judge.

TUTTLE, Senior Circuit Judge:

This is an appeal from a district court judgment, 652 F.Supp. 120, which dismissed the plaintiff's suit under the Internal Revenue Code Section 7426, providing for an action to be filed by a person who claims that his property has been improperly levied upon for the taxes due by a different taxpayer.[1]

This non-jury trial began with the trial court addressing the plaintiff: "All right, sir. Call your first witness."

To this statement, Mr. Boda, plaintiff's counsel answered: "Your Honor, as I understand it, because of the nature of this action, the government is under the burden to proceed and in lack of proof the plaintiff prevails. I have authority, I believe."

Government's counsel, Mr. Pellitier, then responded: "Your Honor, if I may respond for a moment. The taxpayer must prove he has standing in this action and the standing requirement in this action is that he has a connection in this property and he is, in fact, the owner. Once he shows standing ..."

Here, the court interrupted and said: "Then the burden shifts," to which Mr. Pellitier responded: "We must show a nexus."

The court then stated: "Right."

Thereupon, plaintiff, K.A. Morris, took the witness stand and testified to the fact that the title to the house at issue and the vacant lot had been in him, and that he had sold the house and taken a second mortgage in payment and was receiving monthly payments on the second mortgage, and that the government had levied an assessment against both the second mortgage payments and on the vacant lot which was still titled in the plaintiff. He thus established the "standing" required by the trial court. Instead, however, of then giving the government the opportunity of proving the "nexus," plaintiff continued to testify to facts by which he undertook to prove that he himself had provided the funds from his own sources that had gone into the purchase price of the house and lot. After the plaintiff had testified, his counsel then called as his second witness one Craig Garvin, Special Agent, Criminal Investigation Division, Internal Revenue Service, who testified as to the investigation which he had made concerning the taxpayer, Stephen M. Morris, the son of the plaintiff, against whom the government had filed a jeopardy assessment of over $300,000. Responding to questions from plaintiff's counsel, Special Agent Garvin testified to connections that he had found between the son, his girlfriend, and the purchase price of the house and the lot which had been put in the name of the plaintiff.

At the close of the plaintiff's testimony and that of the special agent, the government moved for an involuntary dismissal

---

1. 26 U.S.C. § 7426 provides in relevant part that:

 If a levy has been made on property ... any person (other than the person against whom is assessed the tax out of which such levy arose) who claims an interest in or lien on such property and that such property was wrongfully levied upon may bring a civil action against the United States in a district court of the United States.

pursuant to Rule 41(b), F.R.C.P.[2]. The trial court, concluding that the special agent's testimony had established the nexus between the taxpayer and the property, and plaintiff's counsel having stated he "had nothing further," granted the motion. This appeal followed.

## I. DISCUSSION

The plaintiff-appellant contends that the discussion with the trial court, quoted above, placed the burden on him to prove the nexus between the taxpayer and the property which was in the name of the plaintiff, the taxpayer's father. Based upon that interpretation of the court's statement, the plaintiff contends that he was required to put on the witness stand not only the plaintiff himself who then undertook to prove the *"absence"* of a nexus, but that he also had to put on the witness stand the special agent to show how nebulous was the government's contention that funds belonging to the son and taxpayer had gone into the purchase of the house and the lot.

To the contrary, it seems plain that the trial court accepted the correct legal principle that there was an initial burden on the taxpayer to show that he had title or some other ownership in the property and that the government had made a levy on that property because of a tax assessment against another taxpayer, and that after such a showing had been made by the taxpayer, the burden then shifted to the government to prove a nexus.

This is made evident by the language used by the district court in its order:

In a post-levy proceeding, the IRS "must justify its extraordinary action in connecting a third party's property to the particular delinquent taxpayer." *Valley Finance, Inc. v. United States,* 629 F.2d 162, 171 n. 19 (D.D.C.1980), *cert. denied sub nom. Pacific Development, Inc. v. United States,* 451 U.S. 1018 [101 S.Ct.

3007, 69 L.Ed.2d 389] (1981). The plaintiff, however, retains the ultimate burden of proof of persuading the district court that the levy should be overturned. *Id.* When the basis for IRS action has been explored during discovery, the seizure of property potentially may become permanent, and the trial court is rendering final judgment, "the government must establish its asserted nexus between taxpayer and a third party by substantial evidence." *Id.* R1–36.

The parties are not in disagreement as to what the cases require with respect to the shifting burdens of proof in a case under Section 7426. The point of difference between appellant and the Internal Revenue Service in this case is appellant's argument that the trial court placed on the plaintiff below the burden of proving the nexus, that is, the relation between the taxpayer and the property. The cases cited by appellant in support of its position merely establish the requirement that the government prove the nexus. *See Flores v. United States,* 551 F.2d 1169 (9th Cir.1977), and *Valley Finance, Inc. v. United States,* 629 F.2d 162 (D.C.Cir.1980), *cert. denied sub nom. Pacific Development, Inc. v. United States,* 451 U.S. 1018, 101 S.Ct. 3007, 69 L.Ed.2d 389 (1981). Both of these cases clearly establish the principle, with which the government agrees, that the burden of proving the connection between the taxpayer and the property at issue is on the government. Thus, the only dispute here is whether the testimony of the plaintiff and of the Internal Revenue special agent, who also testified on behalf of the plaintiff, was sufficient to establish the nexus and, if so, whether the plaintiff "carried the burden of proof of persuading the district court that the levy should be overturned."

The testimony of K.A. Morris, the appellant, was generally to the effect that he had saved funds during his entire working life, that he did not trust banks, and that he engaged in many "extra-curricular" ac-

**2.** Rule 41(b) in relevant part provides:

After the plaintiff, in an action tried by the court without a jury, has completed presentation of his evidence, the defendant, without waiving his right to offer evidence in the

event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief....

tivities, such as bee-keeping and buying and selling real estate, and that the profits from such transactions were not banked by him but were secreted around the house. He said that he kept money in a filing cabinet, in the refrigerator, in a sewing machine, in a washing machine, and under the sink, and even outside of the house buried in the yard. He testified variously that he had some $10,000 of such "reserve funds" that he could immediately put his hands on, and that he had between $50,000 and $80,000 of such funds. He also testified that he had at one time, some $60,000 in bank deposits or certificates of deposit. In response to one question as to how he paid for "houses and lots" which he had bought, he stated: "With cash." He also stated, however, that as to the house which is here involved, he had sent the money for the closing of the deal to a lawyer who was a friend of his son, Stephen Marco Morris, and that the amount included both cash and cashier's checks. He did not remember the amounts of cash or the amounts of cashier's checks. No cashier's checks were introduced in evidence. His testimony as to the sending of the purchase price of the lot was that that was paid for all in cash or cashier's checks and that the purchase price for the house, $27,000, was paid for partly in cash and cashier's checks and partly by a $10,000 new automobile which he directed the purchaser of the house to title in Sara Jane Sherer, with whom his son lived next door to the house here in question. He did not remember who had delivered the cash or cashier's checks for either purchase price. He testified that the house was sold to the present owners because of an inquiry made of his son, and that the entire negotiation for its sale was conducted by his son, and that the papers were signed through a lawyer friend of his son. He did not testify that he had paid a fee of any kind to this lawyer in the transaction. He testified that Ms. Sherer had paid him $8,000 towards a price of $10,000 for the automobile and either that she owed him the remaining $2,000 or she could consider it as a wedding present if she and his son, Stephen, with whom she was living, should be married.

Plaintiff next called as his witness, Special Agent Craig Garvin. Since his testimony is the basis of the government's contention that it proved the connection between K.A. Morris' son, Stephen, and the purchase price of the house and lot in question, we consider it appropriate to quote substantially all of his testimony. We do this for the reason that appellant complains that some of the testimony given by the special agent was hearsay and some was conclusory. Of course, since he had been called as a witness by the plaintiff, no objections were made at the trial to his testimony on either ground. The testimony follows:

Q. You have heard him testify not only here today but at the deposition about selling various lots and so forth during the course of his life?

A. That's correct.

Q. Do you have any reason to believe that didn't take place?

A. As far as the lots?

Q. Yeah. Let me ask you if you have any proof that he never sold or acquired these pieces of property?

A. No, sir.

Q. Okay. Where did the money come from that was used to purchase the lot?

A. Sara Jane Sherer.

Q. Okay. You mean who physically brought it to Ramos? (the lawyer).

A. No, Sir. I mean the checks were drawn on Sara Jane Sherer's bank account.

Q. Do you know who gave the money to her? Do you see what I'm saying?

A. Yes, sir. They were in her savings accounts. There were deposits throughout the year of cash deposits into a savings account and of course any investigation revealed to my satisfaction that Sara Jane Sherer was also a nominee for Mr. Steven Markham (sic) Morris.

Q. Okay. Do you know now and can produce documentation that the money for the purchase of this lot and the money for the purchase of

the house both in the name of K.A. Morris did not come from K.A. Morris?

A. I believe the cashier's—

Q. I'm not asking you what you believe though. Can you say definitely that it didn't come from him?

A. Yes, sir.

Q. You can say definitively that he never had certain amounts of currency in his house?

A. You didn't ask me that question.

Q. Can you say definitely that the source of the funds for the purchase of the property was not Mr. Morris?

A. Yes, sir.

Q. How so?

A. Through the cashier's checks that were drawn from Sara Jane Sherer's bank account, both for the house and both for the lot.

Q. I'm saying the source of the funds.

A. The source of the funds were cash deposits into Sara Jane Sherer's savings account.

Q. By Mr. Morris? Do you know that Mr. Morris didn't give the money to Sara Jane to take and get cashier's checks or take and get to the attorneys?

A. I testified he didn't.

Q. I'm saying did you know that he didn't do that?

A. My investigation revealed that Steven Markham (sic) Morris had used Sara Jane Sherer as a nominee based on Sara Jane's testimony and based on her tax returns that she could not have accumulated that kind of money.

Q. Can you say that Mr. Morris could not or did not accumulate the money to buy the house and the lot?

A. My investigation showed that there was no connection between Mr. Morris and Sara Jane Sherer.

Q. Can you say that Mr. Morris did not accumulate the funds over the course of his life to buy the house

and to buy the lot and that that's not where the money came from?

A. I do not believe that he did, no.

Q. I know that. What I'm saying is do you know for a fact that he didn't have the money in his house, okay, that he's not the one that bought the property, that he's not the source of the funds for the purchase of the property?

A. A special agent interviewed Mr. Morris and Mr. Morris made it quite clear to him that he didn't have any money and could not have done that.

Q. Mr. Morris is fairly secretive about his money, is he not?

A. Appears to be.

Q. Didn't want to tell you where he kept it and so forth?

A. That's what he said.

Q. Let me ask you the question one more final time. Can you say definitively that he did not take his money out of his safe or washing machine or whatever and give it to them for the purchase of the properties?

A. I can say that he didn't.

Q. You believe that?

A. Based on the documents, that's correct.

Q. You believe that he didn't?

A. That's correct.

Q. But you don't know that he didn't?

A. I don't think Mr. Morris did that, no.

■ While we recognize that some of the answers given by Special Agent Garvin were hearsay and some were conclusory, no objection by plaintiff's counsel was made to any of the answers. Regardless of whether a party is bound by his witness' speculative or conclusory answers,[3] it is clear that he is bound by answers that are hearsay, if not objected to. *Spiller v. Atchinson, T & S.F. Ry. Co.*, 253 U.S. 117, 40 S.Ct. 466, 64 L.Ed. 810 (1920). In *Spiller*, the Court said:

The evidence was not objected to as hearsay when introduced, nor, indeed, at any time during the hearing before the

**3.** We note that appellant does not even now claim that any of Craig's testimony was inad-

missible. He contends only that it was insufficient to support the finding of the "nexus."

Commission. Counsel did in some instances assert that there was a failure of proof and suggest that the proceeding out to be dismissed. But the objections came too late, and were too general in character, to be equivalent to an objection to the reception of the evidence because hearsay. Even in a court of law, if evidence of this kind is admitted without objection, *it is to be considered, and accorded its natural probative effect, as if it were in law admissible. Diaz v. United States,* 223 U.S. 442, 450 [32 S.Ct. 250, 251, 56 L.Ed. 500]. *Rowland v. St. Louis & San Francisco R.R. Co.,* 244 U.S. 106, 108 [37 S.Ct. 577, 578, 61 L.Ed. 1022]; *Damon v. Carrol,* 163 Massachusetts, 404, 408 [40 N.E. 185].

*Id.* at 130, 40 S.Ct. at 472 (emphasis added.)

We find therefore that it is perfectly clear from Garvin's answers that Morris had told an Internal Revenue Agent that he did not have the funds with which he could purchase these properties and that the property was paid for out of the bank account of Sara Jane Sherer, and that she had been used as a nominee by the taxpayer, Mr. Morris's son, over the years, who had made regular deposits in her bank account from which the cashier's checks were found to have been drawn.

 It is clear, therefore, that the government proved the necessary nexus between the taxpayer and the property to the extent required in such a case as this. It then became the burden of the plaintiff to convince the trier of fact, the trial judge, that the story told by Mr. Morris as to his payment of the purchase price of the house and the lot was correct and that of the Internal Revenue Agent was wrong. As to this, the trial court found Mr. Morris' statement to be "preposterous" in light of the evidence of his income tax returns for several years which showed, for a family of four, income reported from a low of some $12,000 to a high of some $27,000. The trial court therefore disbelieved the testimony of Mr. Morris and accepted as true the testimony of Special Agent Garvin.

Dealing with these two witnesses, the trial court made the following comment in its findings of fact and conclusions of law:

Considering plaintiff's hourly and salaried earning history; his savings at banks and on his premises; and his selling and investment experience, the Court concluded that plaintiff's testimony, that he was able to amass so much cash, was not credible. *See Wheeler v. Holland,* 218 F.2d 482, 483 (5th Cir.1955) (per curiam). Furthermore, the Court concluded that defendants, through the testimony of Special Agent Garvin, showed that the checks that purchased the subject properties were drawn from the savings accounts of the girlfriend of plaintiff's son. Consequently, defendants established the nexus between the delinquent taxpayer and the third party, plaintiff Morris, *by substantial evidence.* The Court concluded that plaintiff did not sustain his burden of proving that the levy and lien should not have been imposed. Therefore, the titles could not be quieted in his name.

(Emphasis added.)

## II. CONCLUSION

Since it was the duty of the trial court in this non-jury case to make findings of fact and conclusions of law based on the evidence as it stood at the time the motion under Rule 41(b) was filed, we conclude that there was sufficient evidence on which the trial court's decision to credit the testimony of the special agent was based. The court's decision to grant the motion, therefore, was warranted because the plaintiff was under the final obligation to persuade the district court that the government action should be overturned. *See Valley Finance, Inc. v. United States,* 629 F.2d 162, 171 fn. 19 (D.C.Cir.1980). In order to carry its burden of proof that the government action should be overturned, it was the appellant's obligation to convince the trial court that the case made out by him as to his contention that he had paid for the property, was the truth of the matter and should be believed by the trial court, rather than the facts as stated by the special

agent of the Internal Revenue Service. This, the appellant failed to do.

The judgment is AFFIRMED.